# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# ROCK HILL DIVISION

| | |
|---|---|
| Rodney R. Dunlap; Kevin Good; Bernard Elam; Joe Neal; Mack Thompson,<br><br>      Plaintiffs,<br>v.<br><br>TM Trucking of the Carolinas, LLC, TNT Trucking of the Carolinas, Inc., T-N-T Trucking of York County, Inc., TNT Propane, Inc., and Tony McMillan, individually,<br><br>      Defendants. | Civil Action No. 0:15-cv-04009-JMC<br><br><br><br><br>**ORDER AND OPINION** |

Plaintiffs Rodney R. Dunlap, Kevin Good, Bernard Elam, Joe Neal and Mack Thompson (collectively "Plaintiffs") filed this civil rights action against Defendants TM Trucking of the Carolinas, LLC, TNT Trucking of the Carolinas, Inc., T-N-T Trucking of York County, Inc., TNT Propane, Inc. and Tony McMillan ("McMillan") (collectively "Defendants") pursuant to 42 U.S.C. § 1981 alleging claims for hostile work environment and constructive discharge. (ECF No. 1 at 14 ¶¶ 80–83.)

This matter is before the court on Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] (ECF No. 70.) Specifically, Defendants assert that "there is no genuine issue of material fact and that they are entitled to summary judgment on each Plaintiffs' claim." (Id. at 1.) In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02(B)(2)(g) (D.S.C.), the matter was referred to United States Magistrate Judge Shiva V. Hodges for pretrial handling. On August 24, 2017, the Magistrate Judge issued a Report and

---

[1] The court observes that from this point forward, "Rule" refers to the Federal Rules of Civil Procedure.

Recommendation (ECF No. 78) recommending that "Defendants motion be granted as to Plaintiffs' constructive discharge claim and denied as to Plaintiffs' claims for hostile work environment." (Id. at 14.) Both Plaintiffs and Defendants filed Objections to the Magistrate Judge's Report and Recommendation, which Objections are presently before the court. (ECF Nos. 80 & 81.) For the reasons set forth below, the court **ACCEPTS IN PART** the Magistrate Judge's recommendation and **DENIES** Defendants' Motion for Summary Judgment as to Plaintiffs' claim for hostile work environment and **DENIES** Defendants' Motion for Summary Judgment as to the claim of Plaintiffs Dunlap, Good and Neal for constructive discharge.

## I. RELEVANT BACKGROUND TO PENDING MOTION

Defendants TM Trucking of the Carolinas, LLC,[2] TNT Trucking of the Carolinas, Inc.,[3] T-N-T Trucking of York County, Inc.,[4] TNT Propane, Inc.[5] (collectively "Corporate Defendants") are all engaged in the business of transporting/hauling goods. (ECF No. 74-1 at 20:22–21:5.) Corporate Defendants are all physically located at 605 Albright Road in Rock Hill, South Carolina. (Id. at 19:9–23.) McMillan is the one hundred per cent owner of Corporate Defendants. (Id. at 18:3–23.) McMillan possesses ultimate hiring and firing authority as to Corporate Defendants. (Id. at 32:4–15 & 73:10–74:5.) McMillan is the only individual with check writing authority for Corporate Defendants. (Id. at 28:3–10.) McMillan is the individual responsible for "implementing the human resources functions" and for ensuring that Corporate

---

[2] TM Trucking of the Carolinas, LLC "is a licensed short-haul carrier using dump trucks to transport construction materials to and from construction sites for third-party vendors." (ECF No. 70-1 at 3.)

[3] TNT Trucking of the Carolinas, Inc. "is a licensed long haul carrier transporting dry freight to and from construction sites for third-party vendors." (ECF No. 70-1 at 3.)

[4] T-N-T Trucking of York County, Inc. "is a licensed short haul carrier using dump trucks to transport construction materials to and from construction sites for third-party vendors." (ECF No. 70-1 at 3.)

[5] TNT Propane, Inc. "provides home heating services by delivering propane tanks to residential customers." (ECF No. 70-1 at 4.)

Defendants are "compliant with federal and state equal employment opportunity laws." (Id. at 32:25–33:8.)  Additionally, McMillan is responsible for dispatching trucks and assigning their drivers. (Id. at 34:12–20.)

Plaintiff Dunlap drove a dump truck for Defendants T-N-T Trucking of York County, Inc. and/or TNT Trucking of the Carolinas, Inc. (together the "TNT Defendants") from June 21, 2013, through January 25, 2014. (ECF No. 71-1 at 5:20:6, 11:44:9–24 & 19:76:16–21; ECF No. 74-1 at 58:14–17.)  Plaintiff Neal was employed as a dump truck driver by TNT Defendants from May 29, 2012, through May 10, 2013. (ECF No. 71-4 at 7:27:21–28:17 & 8:31:22–23; ECF No. 74-1 at 62:10–19 & 63:24–65:11; ECF No. 74-5 at 4:22–23.)  Plaintiff Good worked for TNT Defendants as a dump truck driver from August 15, 2012, to February 4, 2014. (ECF No. 71-3 at 9:33:8–20, 11:44:11–16 & 14:54:18–25; ECF No. 74-1 at 68:6–11.)  Plaintiff Elam was employed as both a long haul driver and dump truck driver for TNT Defendants from September 16, 2010, until December 13, 2013. (ECF No. 71-2 at 9:36:19–10:37:11; ECF No. 74-1 at 69:8–70:12 & 72:1–3; ECF No. 74-3 at 8:13–15.)  Finally, Plaintiff Thompson worked as a driver for TM Trucking of the Carolinas, LLC on six (6) separate occasions, the last period lasting from January 9, 2012 to March 2014. (ECF No. 71-5 at 6:22:9–14 & 8:30:6–13; ECF No. 74-1 at 77:5–8.)

During their employment, Plaintiffs assert that McMillan used the term "nigger" in the work environment thereby subjecting Plaintiffs to a racially-hostile and abusive working environment and causing the constructive discharge of Dunlap, Good, Elam and Neal.  The following is a comprehensive summation of Plaintiffs' allegations:

Dunlap testified that on a typical day, he and the other drivers would report to work at 7:00 a.m. and would gather in the break room until they were dispatched by McMillan. Dunlap Dep. at 51:18–25. Dunlap testified that the duration of time he spent in the break room with McMillan and the other employees varied depending upon weather conditions. Id. at 51-56.

Dunlap testified that he first heard McMillan use the word "nigger" in July 2013. Dunlap Dep. 69:18–24. He states that he was in the breakroom while McMillan was talking to some of the black employees and McMillan yelled, "Nigger, please." Id. at 70:2–8. Dunlap recounted that McMillan used the word "nigger" frequently throughout his employment, at least one to two times per week until the date he quit. Dunlap Aff. ¶ 2. Dunlap testified that on another occasion he heard McMillan refer to another black employee, Warren Chisholm, as a "country-ass nigger." Id. at ¶ 3. In response to hearing this, Dunlap asked McMillan, "What's up with you and your use of that word?" Id. According to Dunlap, McMillan replied that the word "nigger" meant an "ignorant person," and that Dunlap should "look it up in the dictionary." Id.; Dunlap Dep. at 83:24-84:5. McMillan sometimes referred to a white coworker as a "white nigger," although Dunlap testified that McMillan "would do that after he called the black people niggers to try to cover it up." Dunlap Dep. at 85:15–18. Dunlap testified that on December 20, 2013, McMillan referred to Dunlap and other black employees who were seated at a table in the break room as "niggers," declaring "you think I'm going to give those niggers [referring to Dunlap and his co-workers] anything?" Dunlap Dep. at 91:16–92:4.

On other occasions, Dunlap heard McMillan speak disparagingly about African-Americans. Dunlap testified that on one occasion while he was employed by Defendants, a news story regarding a terrorist attack that had occurred at a shopping mall in Africa was being broadcast on the breakroom television. Id. at 150:20–151:4. Dunlap stated that upon seeing the newscast, McMillan remarked, "Look at those dumb-ass niggers tearing up their country." Id. On another occasion, McMillan referred to the black employees as "stupid asses," "dumb motherfuckers," or "stupid motherfuckers" and declared that a "monkey could do your job." Id. at 151:13–21. According to Dunlap, McMillan directed these comments at the black employees only, and not to the white employees who worked for Defendants. Id. Dunlap testified that one time an employee mentioned in the breakroom that his girlfriend had wrecked her car, to which McMillan responded, "What's she trying to do, play that nigger role, get whiplash for some – get some money for whiplash?" Id. at 152:12–17.

Dunlap recounted that he left his employment with Defendants because he "had just had enough." Id. at 63:17–21 . . . . Dunlap voluntarily resigned by declining to return to work after he started a new job.

4

Good stated that McMillan used the word "nigger" in his presence on a frequent basis. Good Dep. at 76:23–77:1. Good recounted that McMillan called him a "nigger" when he helped McMillan deliver a stove to McMillan's mother's home in Georgia some time in 2013. Id. at 42:23–43:10. Good testified that McMillan called him a "nigger" again during the fall of 2013 when he returned to the yard to have the brakes on his truck adjusted. Id. at 51:11–21. On another occasion, McMillan remarked in Good's presence that he could not "stand that bald-headed fucking nigger," referring to another black coworker. Id. at 50:9–11. In response to that remark, Good told McMillan, "If you say that about him you might as well be calling me that." Id. at 50:13–15. Good told McMillan that he should not use that word in the workplace. Id. at 50:15–19.

Good testified that he did not and does not use the term "nigger" and did not like being called a "nigger." Id. at 47:2–13. Good further testified that on April 24, 2014, McMillan approached him and asked that he sign a document indicating that it was okay for McMillan to use the word "nigger" in his presence. Id. at 72:7–19. Good refused to sign that document. Id.

Good testified that he resigned because he did not appreciate the way McMillan spoke to him and also because he needed benefits. Id. at 174:17–22.

Elam testified that he heard McMillan use the term "nigger" when he got upset or "cussed and fussed" at other black coworkers. Elam Dep. at 93:16–94:6. On one occasion, McMillan was on the truck radio and asked, "Who is playing that nigger music?" when another driver played a Michael Jackson song. Id. at 51:5–52:19. On another occasion, McMillan commented in Elam's presence, "these niggers be tripping," in reference to a murder that had been committed in a nearby black neighborhood. Id. at 54:1–21.

Elam testified that on one occasion he told McMillan's daughter that her dad should not be using racial slurs. Id. at 55:4–18. In response, McMillan's daughter stated, "Well, you don't know my daddy." Id. In addition to his complaint to McMillan's daughter, Elam told McMillan that he should stop using the "N-word" because "that's not good." Id. at 56:12–75:12. McMillan, however, continued to use that term in his presence. Id. at 122:22-123:4. Elam testified that he "didn't feel it was right" for McMillan to use that word. Id. at 162:3–9.

Neal testified in his deposition that he heard McMillan use the "N-word" within the first three weeks of his date of hire. Neal Dep. 33:24–34:12. Neal recounted that McMillan was the only one whom he heard use that word in the workplace. Id. Neal testified that McMillan used the word while in the breakroom and that McMillan used the word regularly. Id. Over the course of his twelve months of employment with the Defendants, Neal estimated that he heard McMillan use the term "nigger" over 80 times. Id. at 47:3–10. Neal testified that on one occasion during the summer of 2012, McMillan called him a "nigger" in a telephone

conversation in which McMillan accused him of breaking the drive shaft of his truck. Id. at 35:18–35:21. According to Neal, his truck stalled, slid down a small embankment, and would not restart. Id. Neal stated that when he called McMillan to report what had happened, McMillan became mad, cursed at him, and said, "Nigger, it sounds like you've done broke the drive shaft." Id. Neal testified that upon his return to Defendants' business premises, he confronted McMillan and told him "not to ever call me that again and don't ever speak to me the way you spoke to me." Id. at 36:22–37:21. Although McMillan never called him a "nigger" again and offered an apology to him with respect to this incident, Neal believes that McMillan was apologizing for having wrongly accused him of damaging the truck—not for calling him a "nigger"—because McMillan continued to use the racial slur in his presence to refer to other black employees. Id. at 37:21–38:23; 70:11–71:10. Neal further recounted that he heard other black employees, including Elam, complain to McMillan about his use of the "N-word." Id. at 75:8–19. In response to these complaints, McMillan would reply by saying "the word nigger means white trash and he'd say, 'look it up in the dictionary.'" Id. Neal voluntarily resigned to take a job where he was making more money.

Thompson testified that when he returned to work in January 2014 after a heart attack, McMillan greeted him by saying, "Nigger, I thought you was dead . . . I was looking for your black ass to be dead in the obituary." Id. at 20:10–22. Further, during his last period of employment with Defendants, Thompson testified that he heard McMillan use the term every day he was in the shop. Id. at 50:24–52:3. He also testified that he once heard McMillan use the term "nigger" when he told another employee in the company breakroom to look up the word in a dictionary. Id. at 24:6–10.

Thompson stated that while he enjoyed working, he did not enjoy McMillan's calling him a "nigger." Thompson stated that hearing the term "made me feel kind of bad and like humiliated but it just – I let it go in one ear and keep going. But as he kept doing it, you know, on a regular basis, it kind of just got to you." Id. at 50:20–23.

(ECF No. 78 at 3–8.)

McMillan admits that he uses the term "nigger" at work while owner of Corporate Defendants. (ECF No. 74-2 at 12:5–6.) McMillan denies that he directed the term "nigger" at anyone directly or used it to refer to an African-American. (Id. at 13:6–8 & 14:4–7.) McMillan also testified that it is possible he used the term "nigger" in the presence of Plaintiffs while they were employed by Corporate Defendants. (ECF No. 74-2 at 19:7–22.) McMillan asserts that no one including Plaintiffs have ever told him that "nigger" was offensive or asked him not to use

the term.  (Id. at 13:25–14:4.)  McMillan claims that almost everyone employed by Corporate Defendants, including Plaintiffs, said "nigger" daily in the workplace.  (Id. at 14:17–16:24.)  However, Plaintiffs deny that others in Corporate Defendants' workplace used the term.  (E.g., ECF Nos. 74-3 at 20:5–7 & 74-5 at 6:21–7:18.)

On September 28, 2017, Plaintiffs filed a civil rights Complaint against Defendants pursuant to § 1981 alleging that all Plaintiffs were subjected to a racially hostile work environment and that Plaintiffs Dunlap, Good, Elam and Neal were constructively discharged from their jobs.  (ECF No. 1 at 14 ¶¶ 80–83.)  On February 1, 2017, the parties completed discovery.  (See ECF No. 48)  Defendants then moved for summary judgment on April 24, 2017.  (ECF No. 70.)  Plaintiffs filed a Response in Opposition to Defendants' Motion for Summary Judgment on May 15, 2017, to which Defendants filed their Reply to Plaintiffs' Response in Opposition to Motion for Summary Judgment on June 5, 2017.  (ECF Nos. 74 & 77.)  In accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02 (D.S.C.), the Magistrate Judge, after reviewing the parties' submissions, issued the aforementioned Report and Recommendation on August 24, 2017, recommending that "Defendants motion be granted as to Plaintiffs' constructive discharge claim and denied as to Plaintiffs' claims for hostile work environment."  (ECF No. 78 at 14.)  On September 5, 2017, Plaintiffs filed their Objections to the Magistrate Judge's Report and Recommendation, followed by Defendants filing their Objections on September 7, 2017.  (ECF Nos. 80 & 81.)  Plaintiffs filed a Reply in Opposition to Defendants' Objections on September 20, 2017.  (ECF No. 82.)

The court heard argument from the parties on the instant Motion at a hearing on October 17, 2017.  (ECF No. 92.)

## II. JURISDICTION

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims against Defendants under 42 U.S.C. § 1981, which guarantees the rights of a protected class of individuals "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, . . . ." Id.

## III. LEGAL STANDARD

A. The Magistrate Judge's Report and Recommendation

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with this court. See Mathews v. Weber, 423 U.S. 261, 270–71 (1976). The court reviews de novo only those portions of a magistrate judge's report and recommendation to which specific objections[6] are filed, and reviews those portions which are not objected to - including those portions to which only "general and conclusory" objections have been made - for clear error. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983); Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). The court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. See 28 U.S.C. § 636(b)(1).

B. Summary Judgment under Rule 56

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[6] An objection is specific if it "enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." One Parcel of Real Prop. Known As 2121 E. 30th St., 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Thomas v. Arn, 474 U.S. 140, 147 (1985)).

R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. Newport News Holdings Corp. v. Virtual City Vision, 650 F.3d 423, 434 (4th Cir. 2011).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990). The non-moving party may not oppose a motion for summary judgment with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

## IV. ANALYSIS

A. The Report and Recommendation

In the Report and Recommendation, the Magistrate Judge determined that Plaintiffs demonstrated a prima facie case of hostile work environment under § 1981. In reaching this conclusion, the Magistrate Judge observed that Plaintiffs had presented sufficient evidence to demonstrate that McMillan's conduct–his frequent use of the word "nigger"–was (1) unwelcome, race-based, and sufficiently severe and pervasive to alter the conditions of Plaintiffs'

9

employment and create an abusive environment and (2) imputable to Plaintiffs' employer because McMillan was the sole owner of all Corporate Defendants. (ECF No. 78 at 9–12.) As a result, the Magistrate Judge recommended that "Defendants' motion for summary judgment be denied as to Plaintiffs' hostile work environment claim." (Id. at 13.)

As to the constructive discharge claim brought by Plaintiffs Dunlap, Good, Elam and Neal, the Magistrate Judge was not persuaded that they showed either that (1) "McMillan's actions were intended to force any of them to quit" or (2) "McMillan's use of racial epithets was targeted at [t]h[e]m more than other employees or that it became increasingly worse during their employment, such that it became intolerable close to their resignation." (Id.) Accordingly, the Magistrate Judge recommended that "Defendants be granted summary judgment on Plaintiffs' claims of constructive discharge." (Id. at 14.)

B.  Defendants' Objections

Defendants first assert that the Magistrate Judge erred in denying summary judgment to Defendant TNT Propane, Inc. (ECF No. 81 at 3.) Defendants assert that TNT Propane is entitled to summary judgment on all Plaintiffs' claims because "[a]t no time during the relevant time-period were any of the Plaintiffs employed by TNT Propane." (Id. (citing ECF No. 70-1 at 2, 5, and 15 at n.7).)

Defendants next assert that the Magistrate Judge erred when she found that Plaintiffs had sufficiently satisfied a prima facie case of race-based hostile work environment. (Id. at 4.) Defendants further assert that the Magistrate Judge erroneously relies on "Plaintiffs' inconsistent and contradictory testimony about the use of the term 'nigger' and the alleged incidents where the Plaintiffs were called 'nigger'" when Fourth Circuit precedent requires a race-based hostile work environment to be shown "by accounts of specific dates, times or circumstances." (Id. at 3

& 12 (citing Carter v. Ball, 33 F.3d 450, 458–59 (4th Cir. 1994)).) As a result of the foregoing, Defendants argue that they are entitled to summary judgment on Plaintiffs' hostile work environment claim due to the aforementioned lack of evidentiary specificity coupled with Plaintiffs' failure to submit any evidence of adverse employment actions resulting from McMillan's conduct. (Id. at 14–15.)

C. Plaintiffs' Objections

Plaintiffs Dunlap, Good, Elam and Neal object to the Magistrate Judge's recommendation of summary judgment for Defendants on the constructive discharge claim. (ECF No. 80 at 1.) Specifically, Plaintiffs assert that the Magistrate Judge erred "by requiring [] Plaintiffs to present direct evidence demonstrating that McMillan deliberately intended to force each of them to resign." (Id. at 3.) In this regard, Plaintiffs argue that they presented evidence sufficient to demonstrate that McMillan acted with reckless indifference in creating an intolerable working environment and "at some point in time it would be reasonably foreseeable that each Plaintiff might become 'fed up' with a work environment permeated with racial slurs and racially-inflammatory remarks and that they might resign." (Id. at 5.)

Plaintiffs Dunlap, Good, Elam and Neal also assert that the Magistrate Judge erred by concluding (1) "that Plaintiffs failed to show that McMillan's epithets were targeted at them more than other employees or that his harassment of them became increasingly worse during their employment" and (2) "that Plaintiffs' constructive discharge claims were precluded because they 'tolerated McMillan's despicable behavior.'" (Id. at 5–6.) Plaintiffs assert that their evidence demonstrates receipt of "severe, sustained, and unabated" racial harassment by McMillan that "when viewed in a light most favorable to [] Plaintiffs, give rise[s] to a factual dispute regarding the objective intolerability of their working environment." (Id. at 6–7 (citing,

11

e.g., Amirmokri v. Balt. Gas & Elec. Co., 60 F.3d 1126, 1132-34 (4th Cir. 1995)).) Moreover, "the fact that Plaintiffs may have put up with McMillan's behavior for a period of time before they resigned is not dispositive." (Id. at 8 (citing El-Reedy v. Abacus Tech. Corp., C/A No.: 2:17-cv-0444 DCN, 2017 WL 3446910, at *5 (D.S.C. Aug. 7, 2017)).)

D.  The Court's Review

In light of the parties' respective positions, the court considers each of the claims relevant to Defendants' Motion for Summary Judgment in turn below.

*1.  The Status of TNT Propane, Inc. as a Defendant*

In their Objections, Defendants assert that TNT Propane, Inc. is entitled to summary judgment on Plaintiffs' claims because none of Plaintiffs were ever employed by the company. (ECF No. 81 at 3.) In response to Defendants' assertion, Plaintiffs argue that Defendants neither timely moved for summary judgment "regarding Plaintiffs' claim that Defendants operated as an 'integrated enterprise' or single employer for purposes [of] liability under Section 1981" nor made "any legal argument which would warrant entry of summary judgment on this issue." (ECF No. 82 at 2.)

Upon its review, the court observes that even though Defendants consistently maintained that Plaintiffs were not employed by TNT Propane, Inc., Defendants never made a specific request for summary judgment on behalf of TNT Propane, Inc. in their summary judgment submissions. (See ECF No. 70-1 at 2, 4, 5 & 15 n.7.) Thus, there is merit to Plaintiffs' suggestion that Defendants' failed to timely move for summary judgment regarding TNT Propane, Inc. Notwithstanding the timeliness issue, Defendants' entitlement to summary judgment is undermined by their failure to provide legal opposition to Plaintiffs' argument that "McMillan operated [] [C]orporate Defendants as a single employer." (ECF No. 74 at 2.)

12

In this regard, there are a "variety of tests by which a defendant who does not directly employ the plaintiff may still be the plaintiff's 'employer'" for civil rights purposes. Arallah v. Thompson, 123 F. Supp. 3d 719, 729 (D. Md. 2015). For example, the "integrated employer test" allows for a finding "that separate companies are 'so interrelated that they constitute a single employer'" based on an analysis of the following elements: ""(1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control." Id. (quoting Hukill v. Auto Care, Inc., 192 F.3d 437, 442 (4th Cir. 1999)). The "joint employer test" also allows a court to determine whether multiple entities are the employers of a plaintiff and requires consideration of the following factors:

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.

Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 414 (4th Cir. 2015). Defendants did not address either of these tests or their elements in the filings submitted to the court. Moreover, Defendants did not provide the court with any legal support allowing it to disregard these tests and award them summary judgment based on the simple assertion that Plaintiffs were never employed by TNT Propane, Inc. Therefore, the court agrees with Plaintiffs that Defendants' mere argument that none of Plaintiffs were employed by TNT Propane, Inc. is insufficient to demonstrate error on the part of the Magistrate Judge. Accordingly, the court overrules Defendants' Objection regarding TNT Propane, Inc.'s status as a Defendant in this matter.

*2. Plaintiffs' Claim for Hostile Work Environment*

Plaintiffs allege that a hostile work environment existed at Corporate Defendants' workplace based on McMillan's use of the word "nigger." "The elements of a hostile work environment claim 'are the same under either § 1981 or Title VII.'" Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 221 (4th Cir. 2016) (quoting Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001)). "To demonstrate . . . a racially hostile work environment, a plaintiff must show that there is '(1) unwelcome conduct; (2) that is based on the plaintiff's . . . [race]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'"[7] Okoli v. City of Balt., 648 F.3d 216, 220 (4th Cir. 2011) (quoting Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir. 2010)). A work environment is hostile when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal citations omitted).

To meet the causation element, a plaintiff must show that "but for" the protected characteristic, he would not have been a victim of harassment. See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). The "severe or pervasive" third element of a hostile work environment claim "has both subjective and objective components." Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333 (4th Cir. 2003). First, a plaintiff must show that he "subjectively perceive[d] the environment to be abusive." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22 (1993).

---

[7] A plaintiff can establish a hostile work environment claim by direct evidence, or, as is more common, by relying on the indirect, burden-shifting method set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Kasznski v. Thompson, 83 F. App'x 526, 527–28 (4th Cir. 2003).

Second, a plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998).

Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21. Further, when analyzing the third element, courts examine the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct and its severity; whether it is physically threatening or humiliating or merely constitutes offensive verbal statements; and whether it unreasonably interferes with an employee's work performance. See Harris, 510 U.S. at 23; Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996); see also E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008) (stating that complaints that would objectively give rise to bruised or wounded feelings or incidents that are premised on nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict will not satisfy the severe or pervasive standard).

In this case, the underlying factual support for Plaintiffs' claims is that McMillan, the owner of Corporate Defendants, admittedly used the word "nigger" generally in the workplace and allegedly used it in direct interactions with Plaintiffs, who are African-Americans. McMillan denies that he understood "nigger" as being offensive to African-Americans or that his use of the word might create a racially hostile work environment. (See ECF No. 74-2 at 13:25–14:16.) In support of McMillan's actions, Defendants argue Plaintiffs' claims fail because they cannot remember "specific dates, times or circumstances" of each instance of McMillan's conduct.

"Far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to

African–Americans." Spriggs, 242 F.3d at 185. "No word in the English language is as odious or loaded with as terrible a history." Oladokun v. Grafton School, Inc., 182 F. Supp. 2d 483, 493 (D. Md. 2002). "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." Rodgers v. Western–Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993) (citation and internal quotation marks omitted). "Where such an abhorrent slur is alleged, there is no question that its use was offensive, unwelcome, and racially motivated." Roberts v. Fairfax Cty. Pub. Schs., 858 F. Supp. 2d 605, 610 (E.D. Va. 2012) (citing Shields v. Fed. Exp. Corp., 120 F. App'x 956, 961 (4th Cir. 2005) (unpublished) (per curiam)). "Thus, the relevant question becomes whether the use of racial epithets 'so pervaded the work environment . . . that it was essentially transformed into an atmosphere tinged with racial hostility and altered the conditions of [plaintiff's] employment.'" Id.

After reviewing the totality of the conduct alleged by Plaintiffs, the court agrees with the Magistrate Judge that Defendants are not entitled to summary judgment on Plaintiffs' hostile work environment claim on the basis of race. Importantly, each Plaintiff was able to recall one specific incident[8] where he was directly called a "nigger" by McMillan while also conveying

---

[8] Elam testified that on a day occurring between October and December 2013, McMillan "looked at me, he said, 'Nigger, just sit right there for a little bit longer and I'll be with you.'" (ECF No. 71-2 at 25:100:23–25.) Dunlap testified that on December 12, 2012, McMillan asked Dunlap to return a bag of grits to McMillan because he was not "going to give them niggers anything." (ECF No. 71-1 at 23:92:3–4.) Thompson testified that when he returned to work from surgery in 2014, McMillan greeted Thompson stating "Nigger, I thought you was dead." (ECF No. 71-5 at 5:20:18–19.) Good testified that McMillan called him "nigger" while at work in September or October 2013 (ECF No. 71-3 at 13:51:11–14:53:19) and also during a weekend in 2013 when they were together. (Id. at 11:42:23–12:46:13.) Finally, during the summer of 2012, Neal testified that during a work-related phone call regarding the status of a truck he was driving, McMillan stated "Nigger, it sounds like you've done broke the drive shaft." (ECF No. 71-4 at 9:36:15–16.)

how his usage of the word was generally a common occurrence permeating the work environment. On this basis, the court is persuaded that the conduct Plaintiffs characterize as harassment rises to the level required by law to establish a hostile work environment. See E.E.O.C. v. Central Wholesalers, Inc., 573 F.3d 167, 176 (4th Cir. 2009) (finding alleged gender-based and race-based harassment was sufficiently severe or pervasive where co-workers referred to women as bitches and a co-worker in a cubicle next to the plaintiff had Playboy items, watched pornography in front of her, had a pornographic screensaver, and placed a screwdriver in a Halloween decoration in a sexual manner and where co-workers used racial epithets, some directed at the plaintiff, and two co-workers "kept blue-colored mop-head dolls in their offices which they had hanging by nooses tied around the dolls' necks"); Spriggs, 242 F.3d at 184–86 (holding that supervisor's constant, even daily, use of racial epithets was sufficiently severe or pervasive to survive summary judgment); Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995) (finding the alleged harassment was sufficiently severe or pervasive because an Iranian plaintiff was called "names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf'" on an almost daily basis). Plaintiffs have met their burden of establishing that the alleged treatment they received from McMillan was because of their race. Plaintiffs have further demonstrated that McMillan's conduct was objectively hostile or abusive. Finally, McMillan's actions are imputable to Corporate Defendants because he is their owner. Based upon the foregoing, Plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to whether McMillan subjected Plaintiffs to a hostile work environment based on their race in violation of § 1981. Therefore, Defendants' Objection to the Magistrate Judge's recommendation as to Plaintiff's claim for hostile work environment is overruled. Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' claim for hostile work environment is

denied.

### 3. *Plaintiffs' Claim for Constructive Discharge*

Plaintiffs Dunlap, Good, Elam, and Neal allege that they were constructively discharged from their employment by Corporate Defendants based on McMillan's use of the word "nigger."

In the Fourth Circuit, "[a]n employee is entitled to relief absent a formal discharge, 'if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit.'" Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 186 (4th Cir. 2004) (quoting Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1354 (4th Cir. 1995)). The analysis for constructive discharge claims brought pursuant to 42 U.S.C. § 1981 and Title VII is the same. Parker v. Miller & Long Constr. Co., Inc., No. 5:10-CV-282-D, 2010 WL 5478466, at *1 n.1 (E.D.N.C. Dec. 30, 2010) (citing Honor, 383 F.3d at 186–87).

"A plaintiff alleging constructive discharge must [] prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." Whitten v. Fred's Inc., 601 F.3d 231, 248 (4th Cir. 2010) (citations omitted). "To prove deliberateness, the plaintiff must prove 'that the actions complained of were intended by the employer as an effort to force the employee to quit.'" Id. (quoting Martin, 48 F.3d at 1354). "To act deliberately . . . requires intent . . . to force an employee to leave . . . [which] [i]ntent may be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions, . . . ." Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985) (quoting Holsey v. Armour & Co., 743 F.2d 199, 209 (4th Cir. 1984); J.P. Stevens & Co., Inc. v. NLRB, 461 F.2d 490, 494 (4th Cir. 1972)); see also Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1356 (4th Cir. 1995) (Employer may "prove her employer's intent by demonstrating that her resignation was the "reasonable foreseeable consequence" of the employer's conduct . . . ."). "Intolerability . . . is

assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." Bristow, 770 F.2d at 1255 (citations omitted). "An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers." Id.

At the outset, the court observes that unlike his co-Plaintiffs, Plaintiff Elam did not testify that McMillan's conduct formed the basis for his resignation. Instead, Plaintiff Elam consistently stated that his need to make more money is why he quit his job with Defendants. (E.g., ECF No. 71-2 at 11:44:13–17 & 19:74:8–11.) As a result, the court grants summary judgment to Defendants on Plaintiff Elam's claim for constructive discharge.

Plaintiffs Dunlap, Good and Neal do present evidence that they quit their jobs in response to McMillan's conduct. (See ECF No. 71-1 at 15:59:8–16:61:14; ECF No. 71-3 at 19:76:23–20:78:10; ECF No. 71-4 at 4:16:24–5:17:10.) Construing this evidence and all other evidence presented in the light most favorable to Plaintiffs Dunlap, Good and Neal, the court finds that McMillan's actions create an inference of deliberateness. More specifically, there is sufficient evidence from which a jury could find that the resignations of Plaintiffs Dunlap, Good and Neal were a reasonable foreseeable consequence of McMillan's conduct. The court further finds that the evidence presented is sufficient to raise a factual issue about whether the conditions of Plaintiffs Dunlap, Good and Neal's employment were so intolerable that a reasonable person would have found working for Defendants intolerable. These issues for the jury include a determination of what weight, if any, should be given to any delay of time that occurred before each Plaintiff's resignation. See Green v. Brennan, 136 S. Ct. 1769, 1778 (2016) ("An employee who suffered discrimination severe enough that a reasonable person in his shoes would resign might nevertheless force himself to tolerate that discrimination for a period of time [and] He

might delay his resignation until he can afford to leave."). Therefore, the court sustains the Objections to the Magistrate Judge's Report and Recommendation of Plaintiffs Dunlap, Good and Neal as to their claim for constructive discharge. Accordingly, the court denies Defendants' Motion for Summary Judgment as to the claim for constructive discharge brought by Plaintiffs Dunlap, Good and Neal.

## V. CONCLUSION

Upon careful consideration of the record and the parties' arguments, the court hereby **DENIES** Defendants' Motion for Summary Judgment as to Plaintiffs' claim for hostile work environment and **DENIES** Defendants' Motion for Summary Judgment as to the claim of Plaintiffs Dunlap, Good and Neal for constructive discharge. (ECF No. 70.) The court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff Elam's claim for constructive discharge. The court **ACCEPTS IN PART** the Magistrate Judge's Report and Recommendation (ECF No. 78) and incorporates it herein by reference.

The parties are instructed to confer, agree and propose a fourth amended scheduling order by December 20, 2017, in preparation for the trial of this matter. The trial of this matter will occur no later than August 2018.

**IT IS SO ORDERED**.

*J. Michelle Childs*
United States District Judge

December 12, 2017
Columbia, South Carolina